# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

YVONNE MART FOX, GRANT NESHEIM,
DANIELLE DUCKLEY, and SHELLY
KITSIS, individually and on behalf of all others
similarly situated,

**Case No.: 18-cv-00327-JDP**

*Plaintiffs,*

*v.*

IOWA HEALTH SYSTEM, doing business as
UNITYPOINT HEALTH, an Iowa non-profit
corporation,

*Defendant.*

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     THE UNDERLYING DISPUTE ............................................................................3

        A.      The Security Incidents ...............................................................................3

        B.      The Litigation ............................................................................................5

        C.      Settlement Negotiations .............................................................................8

        D.      The Court's Preliminary Approval Order ..................................................8

III.    TERMS OF THE SETTLEMENT ..........................................................................9

        A.      The Settlement Class ..................................................................................9

        B.      Benefits of the Settlement .........................................................................9

                1.      Monetary Reimbursement ...............................................................9

                2.      Comprehensive Credit Monitoring and Identity Theft Protection
                        Services ........................................................................................10

                3.      Business Practice Commitments and Confirmatory Discovery .......12

                4.      Release Provisions ........................................................................15

IV.     NOTICE HAS BEEN FULLY DISSEMINATED TO THE SETTLEMENT
        CLASS .................................................................................................................16

V.      CLAIMS RATE, OPT-OUTS, AND OBJECTIONS ............................................18

VI.     ARGUMENT ........................................................................................................18

        A.      The Court Should Certify the Settlement Class .......................................19

                1.      Rule 23(a) Is Satisfied ..................................................................19

                2.      Rule 23(b)(3) Is Satisfied ..............................................................23

        B.      The Court Should Grant Final Approval of the Settlement .......................28

                1.      The Rule 23(e)(2) Factors Are Satisfied ........................................30

                2.      The Settlement Is Fair, Reasonable, and Adequate .........................36

VII.    CONCLUSION .....................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ..................................................................................................25

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ..................................................................................................26

*In re Anthem, Inc. Data Breach Litg.*,
    327 F.R.D. 299, 314 N.D. Cal. 2018 ............................................... 27, 28, 32, 34

*Armstrong v. Bd. of Sch. Dirs. of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) ............................................................................ 18, 37

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011)......................................................................38

*In re Banner Health Data Breach Litig.*,
    No. 2:16-cv-02696-SRB (D. Ariz. Apr. 21, 2020), Dkt. No. 198.........................12

*Beaton v. SpeedyPC Software*,
    907 F.3d 1018 (7th Cir. 2018) .......................................................................... 20, 28

*Bills v. TLC Homes Inc.*,
    No. 19-CV-148-PP, 2020 WL 5982880 (E.D. Wis. Oct. 8, 2020) ........................29

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ............................................................................ 27, 28

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ..................................................................................... 35, 36, 38

*Chapman v. Worldwide Asset Mgmt., LLC*,
    No. 04 C 7625, 2005 WL 2171168 (N.D. Ill. Aug. 30, 2005).............................21

*Doe v. Iowa Health System*,
    No. 4:18-cv-453 (S.D. Iowa) ...................................................................................6

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020)...............31

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................21

*Gordon v. Chipotle Mexican Grill, Inc.*,
No. 17-cv-01415-CMA-SKC, 2019 WL 6972701 (D. Colo. Dec. 16, 2019) ................ 33, 34

*Griffin v. Flagstar Bancorp, Inc.*,
No. 2:10-cv-10610, 2013 WL 6511860 (E.D. Mich. Dec. 12, 2013) .................................... 37

*Haley v. Kolbe & Kolbe Millwork Co.*,
No. 14-cv-99-bbc, 2015 WL 9255571 (W.D. Wis. Dec. 18, 2015) ..................................... 23

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
293 F.R.D. 21 (D. Me. 2013) ................................................................................................ 34

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ............................................................... 18, 29, 37, 38

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
877 F.3d 276 (7th Cir. 2017) ............................................................................................... 36

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
No. 3:15-md-2633-SI, 2019 WL 3410382 (D. Or. July 29, 2019) ........................... 24, 25, 28

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ............................................... 38

*Simpson v. Safeguard Props., LLC*,
No. 13 CV 2453, 2014 WL 4652336 (N.D. Ill. Sept. 17, 2014) ........................................... 19

*Smith v. Triad of Alabama, LLC*,
No. 1:14-CV-324-WKW, 2017 WL 1044692 (M.D. Ala. Mar. 17, 2017) ............................ 34

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
No. 1:17-md-2807, 2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) ..................................... 34

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ............................................................................................... 36

*In re Target Corp. Customer Data Sec. Breach Litig.*,
892 F.3d 968 (8th Cir. 2018) ............................................................................................... 33

*In re TJX Cos. Retail Sec. Breach Litig.*,
246 F.R.D. 389 (D. Mass. 2007) .......................................................................................... 34

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) .................................................................................................... 26, 27

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................................... 20, 26, 27

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) .............................................................30

**Statutes**

Action for Consumer Frauds Act, Iowa Code Ann. § 714H, *et seq.* ..............................6

Class Action Fairness Act, 28 U.S.C. § 1715..........................................................17

Ill. Comp. Stat. Ann. 530/10, *et seq.* .................................................................6

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp.
    Stat. Ann. 505/2, *et seq.* ........................................................................6

Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/2,
    *et seq.* ............................................................................................6

Iowa Code Ann. § 715C, *et seq.* ......................................................................6

Wis. Stat. § 100.18, *et seq.* ..........................................................................6

Wis. Stat. § 134.98 ......................................................................................6

Wis. Stat. § 146.81, *et seq.* ..........................................................................6

**Other Authorities**

Fed. R. Civ. P. 23 ...............................................................................*passim*

*Newberg on Class Actions* (5th ed. 2020) ........................................................20, 22

# I.    INTRODUCTION

On September 16, 2020, this Court entered an Order preliminarily approving a Class Action Settlement between Plaintiffs Yvonne Mart Fox, Grant Nesheim, Danielle Duckley, and Shelley Kitsis ("Plaintiffs") on behalf of the class, and Defendant Iowa Health System, doing business as UnityPoint Health ("UnityPoint"). ECF No. 94. The Settlement comes more than two years after the initial Complaint was filed and after significant motion practice and extensive discovery. It represents the result of arm's-length, informed, non-collusive negotiations between UnityPoint and Plaintiffs and their counsel, including three formal mediation sessions as well as numerous additional informal settlement discussions. The Settlement, which is memorialized in the Class Action Settlement Agreement ("Settlement", "Settlement Agreement", or "SA") filed with this Court on June 25, 2020 (ECF No. 86-1), resolves all claims against UnityPoint in the litigation.

The Settlement, as has been preliminarily approved by this Court, ECF No. 94, will provide meaningful monetary and injunctive relief to the approximately 1.4 million Settlement Class members, including at least 12,028 Settlement Class members who have already submitted claims as part of the claims process. *See* Declaration of Cameron R. Azari on Implementation of Settlement Notice Plan and Adequacy of Notices ("Notice Decl.") ¶ 28.[1] This relief includes (i) a one-year subscription to comprehensive credit monitoring and identity theft protection services through Identity Guard's Total Plan, which may be deferred by one year; (ii) reimbursement of Ordinary Expenses of up to $1,000 per Settlement Class member, including the costs of credit monitoring and identity theft protection services incurred up to March 2, 2022 (one year after the Claims Deadline); (iii) reimbursement of Extraordinary Expenses of up to $6,000 per Settlement

---

[1] The deadline to file a claim is March 2, 2021. The Notice Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), will provide a supplemental declaration prior to the February 19, 2021 Final Approval Hearing. Notice Decl. ¶¶ 27 & 34.

Class member; and (iv) structural relief in the form of multiple, detailed commitments by UnityPoint to improve its network and data security measures. The monetary relief and credit monitoring services available to Settlement Class members are not subject to a global cap on settlement benefits—meaning that every Settlement Class member will be fully compensated for valid Claims, independent of the aggregate amount of other Claims submitted. This is a significant benefit as compared to other settlements, in which individual class member recovery is subject to pro rata reduction if the aggregate amount of claims exceeds a global cap. As part of the Settlement, UnityPoint will also separately pay all costs of notice and claims administration, Class Counsel's fees and costs as awarded by the Court in an amount not to exceed $1,575,000,[2] and service awards as awarded by the Court in an amount not to exceed $2,500 for each of the four named Plaintiffs.

Following preliminary approval, Epiq Class Action & Claims Solutions, Inc. "("Epiq"), the Court-appointed settlement administrator, implemented a robust notice plan by providing direct mail notice to all class members at their last known address according to UnityPoint's records. Before mailing, Epiq de-duplicated Settlement Class members' records and updated addresses through the U.S. Postal Service. *See* Notice Decl. ¶¶ 16–17. Postcard Notices were then mailed beginning on October 27, 2020. *Id.* ¶ 17. When 169,666 notices were returned undeliverable with no forwarding address, Epiq is undertaking additional search measures to attempt to locate updated addresses for those class members, which is an ongoing process. *Id.* ¶ 20. Additionally, Epiq maintains a settlement website containing the relevant documents, including the class action complaint, settlement agreement, class notice and claim form. *Id.* ¶ 21. Spanish-language versions of the Long Form Notice and Claim Form are also available electronically as well as by mail upon request. *Id.* Epiq also maintains a toll-free telephone line which provides class members detailed

---

[2] Class Counsel seeks these fees and costs in the concurrently filed Plaintiffs' Motion for Attorneys' Fees, Costs and Incentive Awards.

information about the settlement and allows individuals to request a claim form be mailed to them. *Id.* ¶ 23.

The Class's reaction to the settlement is universally positive. Only 45 Settlement Class members opted out of the Settlement and thus far not one has objected to the terms of the Settlement. *Id.* ¶ 26. Given the extraordinary relief provided by the Settlement, the Settlement should now receive the Court's final approval because it is demonstrably "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e)(2). For the reasons below, and those stated in Plaintiffs' Motion for Preliminary Approval of Settlement (ECF No. No. 83), Plaintiffs ask that the Court certify the Class for Settlement purposes under Rules 23(b)(2) and 23(b)(3), find that the Settlement is fair, reasonable and adequate under Rule 23(e)(2), and thus grant final approval of the Settlement.

## II.    THE UNDERLYING DISPUTE

### A.    The Security Incidents

The Court aptly summarized the underlying facts in its July 25, 2019 Opinion and Order granting in part and denying in part UnityPoint's motion to dismiss, ECF No. 55. UnityPoint is one of the largest integrated health systems in the country. It operates a network of hospitals, clinics, home care services, and health insurers throughout Wisconsin, Iowa, and Illinois. At all times relevant to this litigation, UnityPoint collected, stored, and maintained its patients' and employees' PII and PHI, including patient names, addresses, telephone numbers, email addresses, birth dates, Social Security numbers, insurance information, billing and other financial information, as well as diagnoses, providers, and other medical information.

Plaintiffs allege that, beginning as early as November 1, 2017, cyber-criminals accessed and obtained the PII/PHI of UnityPoint's patients and employees through one or more UnityPoint employee email accounts. UnityPoint did not discover this unauthorized access until at least

February 7, 2018, and did not notify its patients and employees until on or about April 16, 2018. The PII/PHI of approximately 16,429 UnityPoint patients and employees was compromised in this first data breach.

Plaintiffs also allege that cyber-criminals accessed and obtained the PII/PHI of UnityPoint's patients and employees through one or more UnityPoint employee email accounts, beginning as early as March 14, 2018. UnityPoint did not discover this subsequent unauthorized access until on or about May 31, 2018 and did not notify its patients and employees about this unauthorized access until on or about July 30, 2018. The PII/PHI of approximately 1.4 million UnityPoint patients and employees was compromised in this second data breach, which was the second largest healthcare data breach of 2018.[3] Collectively, the first and second data breaches are defined in the Parties' Settlement Agreement as the "Security Incidents."

The PII/PHI alleged to have been accessed and obtained in the Security Incidents included UnityPoint patient and employee names, addresses, email addresses, telephone numbers, dates of birth, Social Security numbers, driver's license numbers, medical record numbers, insurance information, as well as medical information such as providers, dates of service, lab results, diagnoses, medications, surgeries, and other treatments.

Plaintiffs allege that, because of the unauthorized access and compromise of their PII/PHI, UnityPoint's patients and employees have been exposed to a significantly increased risk of identity theft and fraud. Shortly after the Security Incidents, Plaintiffs allege that they and other Settlement Class members suffered actual and attempted identity theft and fraud. For example, a suspicious and unauthorized charge was placed on Plaintiff Nesheim's credit card account, and a fraudulent attempt was made to open a credit card account under his name using his PII/PHI. Plaintiff Duckley

---

[3] *Largest Healthcare Data Breaches of 2018*, HIPAA Journal, https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2018/ (last visited November 24, 2020).

received an alert that her identity had been disclosed on the dark web, received notifications that unauthorized attempts were made to access her online accounts, and was locked out of her credit bureau account due to repeated unauthorized log-in attempts. Plaintiff Kitsis similarly received a fraud alert notifying her that her identity had been disclosed on the dark web following the Security Incidents. All Plaintiffs received a significantly increased amount of unwanted and unsolicited auto-dialed telephone calls, Plaintiff Yvonne Mart Fox received a series of scam medical telephone calls, and Plaintiffs Fox and Duckley also received a markedly increased amount of spam and phishing emails. The risk of identity theft and fraud to Plaintiffs and other Settlement Class members, including financial and medical identity theft and fraud, remains ongoing.

**B.     The Litigation**

After UnityPoint provided notice in mid-April 2018 that the PII/PHI of at least 16,429 patients and employees may have been compromised, Plaintiff Fox retained counsel and filed this class action lawsuit on May 4, 2018. ECF No. 1. UnityPoint filed a motion to dismiss the complaint on June 29, 2018. ECF No. 8. The Parties stipulated that Plaintiff Fox could respond to the pending motion to dismiss or file an amended complaint on or before July 30, 2018, and the Court permitted that extension of time. ECF Nos. 15, 16. On July 30, 2018, Plaintiffs Fox and Nesheim filed the First Amended Class Action Complaint. ECF No. 17.

Shortly thereafter, Plaintiffs learned that a subsequent data breach may have compromised the PII/PHI of approximately 1.4 million patients and employees. Plaintiffs promptly sought leave to file a Second Amended Complaint. ECF No. 18. UnityPoint did not oppose that motion, which was granted by the Court. ECF No. 19. The Court therefore deemed moot UnityPoint's motion to dismiss the original complaint. ECF No. 21.

Plaintiffs Fox, Nesheim, Duckley, and Kitsis filed the Second Amended Class Action

Complaint ("Complaint") on August 13, 2018, which encompasses the two Security Incidents.[4] ECF No. 22. Plaintiffs Fox and Nesheim are residents of Wisconsin, Plaintiff Duckley is a resident of Illinois, and Plaintiff Kitsis is a resident of Iowa.

Plaintiffs' Complaint asserted the following causes of action against UnityPoint: (1) negligence; (2) negligence per se; (3) violation of Wisconsin's Confidentiality of Patient Health Care Records statute; Wis. Stat. § 146.81, *et seq.*; (4) violation of the Wisconsin data breach notification statute, Wis. Stat. § 134.98; (5) violation of the Illinois data breach notification statute, 815 Ill. Comp. Stat. Ann. 530/10, *et seq.*; (6) violation of the Iowa data breach notification statute, Iowa Code Ann. § 715C, *et seq.*; (7) invasion of privacy; (8) misrepresentation; (9) breach of contract; (10) breach of the implied covenant of good faith and fair dealing; (11) violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*; (12) violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/2, *et seq.*; (13) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2, *et seq.*; (14) violation of the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H, *et seq.*; (15) unjust enrichment; and (16) declaratory relief.

UnityPoint moved to dismiss the Complaint on September 17, 2018. ECF No. 27. Plaintiffs filed an opposition brief on October 15, 2018, ECF No. 39, and UnityPoint filed a reply on October 25, 2018, ECF No. 43. On July 25, 2019, the Court granted in part and denied in part UnityPoint's Motion to Dismiss. ECF No. 55. The Court denied UnityPoint's standing challenge and upheld Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair

---

[4] A second lawsuit arising from the same facts, *Doe v. Iowa Health System*, No. 4:18-cv-453 (S.D. Iowa), was filed on November 26, 2018. UnityPoint moved to dismiss or transfer to this District. On September 26, 2019, the court in *Doe* granted this motion in part and ordered that *Doe* be transferred to this District. Accordingly, the plaintiffs in *Fox* moved to consolidate *Doe* with the more-advanced *Fox* case. Mooting this motion, Plaintiff Doe dismissed her suit without prejudice on October 23, 2019.

dealing, unjust enrichment, and violation of Wisconsin's Confidentiality of Patient Health Care Records statute ("Wisconsin Statutory Claim"). *Id.* With respect to Plaintiffs' claims for negligence and negligence per se, the Court upheld the claims of Plaintiffs Fox and Nesheim under Wisconsin law, but dismissed the claims of Plaintiffs Duckley and Kitsis under the laws of Illinois and Iowa, respectively. *Id.* The Court also dismissed the remaining 10 of Plaintiffs' original 16 claims. *Id.*

The Parties have engaged in substantial discovery. Plaintiffs served two sets of requests for production comprising 57 document requests; two sets of interrogatories comprising 35 interrogatories; and 41 requests for admission on UnityPoint. *See* Declaration of Cari Laufenberg in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Laufenberg MPA Declaration") ¶ 6. Plaintiffs also served six deposition notices on UnityPoint and one subpoena on a third party. *Id.* UnityPoint served requests for production comprising 30 document requests as well as 19 interrogatories on each of the four Plaintiffs named in the Complaint, to which Plaintiffs responded. *Id.* The Court entered a Protective Order governing documents and filings containing alleged confidential information as well as an Order governing production of ESI. *Id.* ¶ 7; ECF Nos. 45–48.

After extensive meet and confer efforts, UnityPoint produced more than 600,000 pages of documents. Laufenberg MPA Decl. ¶ 8. Plaintiffs have reviewed these documents and worked with three independent experts to understand the full scope of UnityPoint's alleged data security failures, damages suffered by the Settlement Class, and appropriate remedial measures. *Id.*

Plaintiffs' counsel's extensive analysis of liability and damages issues helped set the stage for class certification briefing, which was in process as the Parties entered settlement negotiations. *Id.* ¶ 9.

**C.    Settlement Negotiations**

After the Court issued its Order on UnityPoint's motion to dismiss, and after document production by UnityPoint was substantially complete, the Parties began to explore the possibility of settlement. *Id.* ¶ 11. On March 3, 2020, the Parties participated in a full-day mediation with the Honorable Judge Morton Denlow (Ret.) of JAMS in Chicago, Illinois. Id. Judge Denlow conducted pre-mediation calls with each party, and the Parties exchanged mediation statements. *Id.*

After an extended mediation session on March 3, 2020, the Parties were unable to reach a resolution of the litigation. *Id.* ¶ 12. The Parties participated in an additional telephonic mediation session with Judge Denlow on March 18, 2020. *Id.* ¶ 13. Under Judge Denlow's auspices, the Parties ultimately reached agreement as to all major settlement deal points. *Id.* After the essential terms of the Settlement had been determined, the Parties engaged in further challenging negotiations, which extended into an additional telephonic mediation session on March 20, 2020. *Id.* The Parties ultimately reached impasse as to a disputed issue, so Judge Denlow made a mediator's proposal, which both Parties accepted. *Id.*

The Parties then continued to negotiate disputed terms until April 10, 2020, when the Parties finalized and executed a written Term Sheet, which reflects the essential terms of the Settlement now offered for final approval. *Id.* ¶ 14.

**D.    The Court's Preliminary Approval Order**

On June 25, 2020, Plaintiffs filed a Motion for Preliminary Approval of the proposed settlement. ECF No. 83. On September 16, 2020, the Court entered an Order Granting Preliminary Approval of the proposed settlement. ECF No. 94. In its Preliminary Approval Order, the Court certified the class for settlement purposes and concluded the terms of the settlement "are 'within the range of possible approval.'" *Id*. The Court also approved the proposed notice plan and set the final approval hearing for February 19, 2021 at 9:00 a.m. *Id.*

### III.     TERMS OF THE SETTLEMENT

**A.     The Settlement Class**

Under the Settlement, the Parties agree to certification of the following Settlement Class: "All Persons to whom UnityPoint sent notification that their personal information and/or protected health information may have been or was exposed to unauthorized third parties as a result of the data security incidents described as the First Data Breach and the Second Data Breach in the Second Amended Class Action Complaint." SA ¶ 17(z). The Class is estimated to include 1.4 million members. The Court approved this Settlement Class in its Order on Preliminary Approval. ECF No. 94 at 4.

**B.     Benefits of the Settlement**

In exchange for release of Settlement Class members' claims against UnityPoint, Settlement Class members may claim and receive any one or more of the following, which are not mutually exclusive:

**1.     Monetary Reimbursement**

UnityPoint will pay valid claims for Ordinary Expenses, including actual time lost and out-of-pocket expenses, incurred between February 7, 2018 and the March 2, 2021 as a result of the Security Incidents, up to a limit of $1,000 per Settlement Class member. SA ¶ 18. Out-of-pocket expenses include: (i) long distance telephone charges; (ii) cell phone minutes (if charged by minute), Internet usage charges (if charged by the minute or by the amount of data usage and incurred solely as a result of the Security Incidents), and text messages (if charged by the message and incurred solely as a result of the Security Incidents); (iii) postage; (iv) documented costs associated with miscellaneous expenses such as notary, fax, postage, copying, and mileage; (v) documented costs associated with credit freezes; and (vi) documented costs of credit monitoring services active between February 7, 2018 and March 2, 2022 (one year after the Claims Deadline).

*Id*. Reimbursement for ordinary time lost is for up to three (3) hours of lost time compensated at $15 per hour upon attestation that time was spent as a result of the Security Incidents. *Id*.

UnityPoint will also pay Claims for Extraordinary Expenses, including extraordinary out-of-pocket expenses and extraordinary additional time lost incurred on or after February 7, 2018 as a result of the Security Incidents, up to a limit of $6,000 per Settlement Class member. SA ¶ 19. Extraordinary out-of-pocket expense reimbursements include, but are not limited to: (i) documented professional fees and other costs incurred to address identity fraud or theft, including but not limited to falsified tax returns, new account fraud, existing account fraud, account takeover, and medical-identity theft; and (ii) other documented unreimbursed losses, fees, or charges incurred as a result of identity fraud or theft, including but not limited to (a) unreimbursed bank fees, (b) unreimbursed card reissuance fees, (c) unreimbursed overdraft fees, (d) unreimbursed charges related to unavailability of funds, (e) unreimbursed late fees, (f) unreimbursed over-limit fees, (g) unreimbursed charges from banks or credit card companies, and (h) interest on payday loans due to card cancellation or due to over-limit situations. Reimbursement for extraordinary compensable additional lost time is for up to ten additional hours of lost time (compensated at $15 per hour), not reimbursed as ordinary compensable lost time, spent resolving documented extraordinary losses. *Id*.

**2.      Comprehensive Credit Monitoring and Identity Theft Protection Services**

UnityPoint will also offer one (1) year of credit monitoring and identity protection services for all Settlement Class members, which can be delayed by one year. SA ¶ 20. The credit monitoring will be provided through Identity Guard's Total Plan, powered by IBM Watson, and will include at least the following, or similar services:

- Up to $1 million dollars reimbursement insurance from AIG covering losses due to identity theft and stolen funds;

- Three bureau credit monitoring providing notice of certain changes to the enrolled Settlement Class member's credit profile;

- Real time authentication alerts in as little as three seconds when someone attempts to make a change to enrolled Settlement Class members' personal account information within Identity Guard's network;

- Alerts based on searches of payday-loan providers and court records and monitoring of the top ten largest U.S. financial institutions, for attempted or actual fraudulent use of the enrolled Settlement Class members' information;

- Dark Web Monitoring that will provide notification if an enrolled Settlement Class member's information such as Social Security number, credit card numbers, financial account numbers, and health insurance number are found on the Dark Web;

- Threat Alerts powered by IBM "Watson's" artificial intelligence of potential threats relevant to the enrolled Settlement Class members found by IBM Watson's artificial intelligence, for instance: breaches, phishing scams, and malware vulnerabilities;

- Customer support and victim assistance provided by Identity Guard;

- Anti-phishing Applications for iOS & Android Mobile devices; and

- Safe browsing software for personal computers and Macs to help protect the enrolled Settlement Class member's computer(s) against malicious content, with an add-on for Safari, Chrome, and Firefox web browsers that delivers proactive malware protection by blocking various malware delivery channels including phishing, malvertisements, and Flash (the extension also blocks content and tracking cookies to help protect personal information).

These credit monitoring and identity protection services are equal to or better than products offered in similar data breach settlements. *See* Final Approval Order at 11, *In re Banner Health Data Breach Litig.*, No. 2:16-cv-02696-SRB (D. Ariz. Apr. 21, 2020), Dkt. No. 198 ("[A]fter careful review, the Court has determined that the coverage and duration of Identity Guard's credit-monitoring and identity-protection services are directly on par with, if not superior to, comparable products offered in similar data breach settlements.") (collecting cases).

### 3.     Business Practice Commitments and Confirmatory Discovery

In addition to the relief set forth above, UnityPoint has made specific commitments to improving its network and data security to address the vulnerabilities that resulted in the Security Incidents, so as to safeguard Settlement Class members' PII and PHI. SA ¶ 22. For at least two years from the date of the Settlement, UnityPoint will adopt, pay for, implement, and/or maintain the following business practice commitments, or substantially similar commitments, related to information security, as set forth in Exhibit A to the Settlement (filed under seal):









UnityPoint has provided Class Counsel with confirmatory discovery sufficient to enable Plaintiffs to verify the business practice commitments that UnityPoint has implemented to date. Moreover, UnityPoint will engage an independent third-party professional services firm to conduct an annual assessment, which will include review of UnityPoint's compliance with the business practice commitments set forth in Exhibit A to the Settlement, and UnityPoint will provide Class Counsel a copy of this annual assessment for two years after the Settlement. SA ¶ 22. Class Counsel will have the opportunity to inquire about each assessment produced, and UnityPoint will be obligated to respond to each such inquiry within thirty (30) days. *Id*. If Class Counsel believes that UnityPoint is not complying with its business practice commitments, Class Counsel will meet and confer with UnityPoint's Counsel before seeking relief from the Court. *Id*.

### 4.     Release Provisions

Once the Settlement becomes final, Settlement Class members will release and discharge UnityPoint from all claims and causes of action of every nature and description (including Unknown Claims), whether arising under federal, state, statutory, regulatory, common, foreign, or

other law, that arise in any way from or relate to the Litigation against UnityPoint or the Security Incidents (other than claims to enforce the Settlement). SA ¶¶ 25-27.

## IV.     NOTICE HAS BEEN FULLY DISSEMINATED TO THE SETTLEMENT CLASS

The Class Notice program was fully executed in accordance with its design and under the terms approved by the Court and satisfies due process requirements. In consultation and collaboration with the parties, Epiq provided the Court-ordered Notice to Class Members through U.S. mail in the manner approved by the Court. Notice Decl. ¶¶ 16-18, 30-33. The proposed notices complied with Rule 23(c)(2)(B), in that they "clearly and concisely state in plain, easily understood language" a description of the Settlement Class, a description of the claims, the names of Class Counsel, a description of Settlement Class members' opportunity to appear at the Fairness Hearing, opt-out and objection specifics, and the manner in which to obtain further information. *See* Fed. R. Civ. P. 23(c)(2)(B); Notice Decl. ¶¶ 16-18, 30-33 & Attachments 3 & 4.

Notice was disseminated to the Settlement Class on October 27, 2020. Notice Decl. ¶ 17. Notice was sent in the form of a double-sided fold-over postcard sent via U.S. mail (1) notifying Settlement Class members of the Settlement and relevant terms, (2) providing Settlement Class members the URL to the Settlement Website and a telephone number they can call to obtain additional information about the Settlement, and (3) instructing Settlement Class members on how to make a Claim. Notice Decl. ¶ 17 & Attachment 3. The postcard notice was initially sent to 1,420,377 individuals who were identified as members of the Settlement Class by UnityPoint's business records. Notice Decl. ¶ 17. Epiq is continuing to update and remail any undeliverable Postcard Notices. Notice Decl. ¶ 17. To date, an additional 1,633 potential class members requested via the toll-free number that notice be sent to them, and Epiq has sent those notices. Notice Decl. ¶ 18.

The Settlement Website (www.uphsettlement.com) was made publicly accessible on

October 27, 2020, providing information on the lawsuit and access to case documents. Notice Decl. ¶ 21. The website includes a summary of the case, a list of important dates, answers to frequently asked questions, key case filings, and contact information for the class action settlement administrator. Notice Decl. ¶ 21. The Settlement Website also displays the claim filing deadline, the deadline to opt-out of the class settlement, the deadline to submit an objection, and the date of the Fairness Hearing. Notice Decl. ¶ 21. To date, the settlement website has been visited 132,013 times, by 24,555 unique visitors. Notice Decl., ¶ 22.

A dedicated email address was also set up on October 27, 2020 to answer questions from potential class members. Notice Decl. ¶ 25. To date, Epiq has received 487 emails and has fully answered 249 emails. *Id.* Epiq has also initiated a response and is in the process of ongoing communications for the other emails received. *Id.* A dedicated toll-free number (1-855-917-3553) was also set up October 27, 2020, providing pre-recorded information and allowing class members to leave a voicemail requesting further information. Notice Decl. ¶ 23. To date, the toll-free number has received 8,425 calls lasting a combined total of 26,934 minutes. Notice Decl. ¶ 24.

In accordance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, CAFA Notice was mailed on July 1, 2020 to the U.S. Attorney General, the Attorneys General of each of the 50 States and the District of Columbia, and the Attorneys General of the recognized U.S. Territories. Notice Decl. ¶ 15 & Attachment 2 ¶¶ 5-9. Additionally, on October 5, 2020, supplemental CAFA Notice was sent to the U.S. Attorney General, the Attorneys General of each of the 50 States and the District of Columbia, and the Attorneys General of the recognized U.S. Territories to provide a copy of the Preliminary Approval Order and updated geographic location of Class Members Report. *See* Notice Decl. ¶ 15 & Attachment 2 ¶¶ 7, 10-11. The 90-day notice period expired on September 29, 2020, and neither Class Counsel nor the Settlement Administrator has received any inquiries from any federal or state official in response to the CAFA notice.

-17-

Declaration of Ronald A. Marron in Support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Incentive Awards and Plaintiffs' Motion for Final Approval of Class Action Settlement ("Marron Decl.) ¶ 8.

Thus, the notice plan ensured that Class members' due process rights were amply protected. *See* Fed. R. Civ. P. 23(c)(2)(B).

## V.   CLAIMS RATE, OPT-OUTS, AND OBJECTIONS

The deadline for Settlement Class Members to submit a claim form is March 2, 2021. ECF No. 94. As of November 30, 2020, Epiq has received 12,028 claim forms from prospective class members. Notice Decl. ¶ 28. Of these claim forms, 11,911 were submitted electronically and 117 claim forms were submitted by U.S. Mail. Notice Decl. ¶ 28. As the deadline to file a claim is not until March 2, 2021, these numbers are preliminary. *Id.*

The objection and exclusion deadline is January 4, 2021. ECF No. 94. To date, only 45 settlement class members have opted out of the settlement and no objections have been received. Notice Decl. ¶ 26. A list of opt outs, following the deadline to opt out, will be provided to the Court so that it may be attached to the final approval order.

## VI.   ARGUMENT

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *see also Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) ("Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.").

Approval of class action settlements normally proceeds in two stages: (1) preliminary approval, followed by notice to the class, and then (2) final approval. *See Manual for Complex*

*Litigation (Fourth)* § 21.63 (2004). The Court completed the first stage in the settlement approval process when it granted preliminary approval on the Settlement and provisionally certified the Settlement Class. ECF No. 94. The Preliminary Approval order made specific preliminary findings that the Class met each of the four Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. ECF No. 94. The Court also found that the Class met each of the Rule 23(b)(3) requirements: predominance and superiority. ECF No. 94. While nothing has changed since the Court made these findings, Plaintiffs will briefly address them below.

For the reasons set forth below, Plaintiffs respectfully request that the Court grant final approval of the Settlement because Rule 23's requirements have been satisfied, the Settlement is fair, reasonable and adequate, and the Court-approved notice plan satisfies due process requirements and has been fully implemented.

## A.     The Court Should Certify the Settlement Class

### 1.     Rule 23(a) Is Satisfied

Federal Rule of Civil Procedure 23(a) enumerates four prerequisites for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Fed. R. Civ. P. 23(a). Each is satisfied here.

#### a.     Numerosity

The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Where the class members are at least 40, joinder is generally considered impracticable." *Simpson v. Safeguard Props., LLC*, No. 13 CV 2453, 2014 WL 4652336, at *2 (N.D. Ill. Sept. 17, 2014) (citing *Swanson v. Am. Consumer Indus.*, 415 F.2d 1326, 1333 (7th Cir. 1969)). Numerosity is readily satisfied here, as approximately 1.4 million individuals were affected by the Security Incidents. SA ¶ 3, ECF No. 94 at 2. Moreover, approximately 12,028 claims have been submitted to date. Notice Decl. ¶ 28.

-19-

### b. Commonality

To satisfy Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and "[c]ommonality is established if plaintiffs and class members' claims "depend upon a common contention," that is "capable of class-wide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Because the commonality requirement may be satisfied by a single common issue capable of classwide resolution, it is easily met. *See* 1 *Newberg on Class Actions* § 3:18 (5th ed. 2020); *see also Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018) (where there are several issues capable of classwide resolution, "[c]ommonality is easily satisfied"). Here, the Settlement Class members' claims all involve common questions of law and fact regarding UnityPoint's data security. Plaintiffs allege that UnityPoint's actions and/or omissions with respect to the Security Incidents harmed Settlement Class members. In this regard, the claims of the Settlement Class members all rise or fall based on UnityPoint's actions and/or omissions, which were made in a uniform manner to each of the Settlement Class members. Plaintiffs' claims raise numerous common issues with common answers, including but not limited to:

- Whether UnityPoint had contractual obligations to safeguard Plaintiffs' and Settlement Class members' PII and PHI;

- Whether UnityPoint breached its contractual obligations to safeguard Plaintiffs' and Settlement Class members' PII and PHI;

- Whether UnityPoint's alleged failures to safeguard Plaintiffs' and Settlement Class members' PII and PHI resulted in the Security Incidents;

- Whether Plaintiffs and Settlement Class members were injured and suffered damages as a result of the Security Incidents;

- Whether UnityPoint has been unjustly enriched as a result of its alleged failures to safeguard Plaintiffs' and Settlement Class members' PII and PHI; and

- Whether Plaintiffs and Settlement Class members are entitled to monetary damages or other relief.

*See* ECF No. 94 at 2-3.

Accordingly, these common issues satisfy the commonality requirement of Rule 23.

### c.    Typicality

Rule 23(a)(3) requires that the claims of the representative plaintiffs be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). In short, to meet the typicality requirement, the representative plaintiffs simply must demonstrate that the members of the class have the same or similar grievances. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 147–48 (1982).

Plaintiffs' claims and those of the Settlement Class members arise from the same course of conduct by UnityPoint. Plaintiffs' claims are typical because they, like all members of the Settlement Class, provided PII and/or PHI to UnityPoint in exchange for services. UnityPoint owed a duty and was contractually obligated to protect and keep that information secure. Plaintiffs, like all other members of the Settlement Class, have sustained injury and damages as a result of UnityPoint's uniform breach of its duty and contractual obligations to adequately safeguard that information. Therefore, Plaintiffs' claims arise out of the same course of conduct, are based on the same legal theories, and seek the same types of damages as the Settlement Class, and meet all necessary standing requirements. *See* ECF No. 94 at 3. Plaintiffs therefore satisfy the typicality requirement.

### d.    Adequacy

Next, the Court must determine if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To adequately represent a class, a named plaintiff must show that he or she can act in a fiduciary role representing the interests of the class and has no interests antagonistic to the interests of the class. *See Chapman v. Worldwide Asset*

*Mgmt., LLC,* No. 04 C 7625, 2005 WL 2171168, at *4 (N.D. Ill. Aug. 30, 2005) ("Three elements must be satisfied: (1) the class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the class representative must have a sufficient interest in the outcome to ensure vigorous advocacy; (3) counsel for the class representative must be competent, experienced, qualified and generally able to conduct the proposed litigation vigorously.") (internal quotation marks and citation omitted). Moreover, adequacy is presumed where a fair settlement was negotiated at arm's-length. *See Newberg on Class Actions*, *supra*, § 13:50, at 11-59.

Plaintiffs and Class Counsel have incurred significant costs and risks, have performed extensive work to date in identifying and investigating potential claims in this action, have established the factual basis for the claims sufficient to prepare a detailed class action complaint, have pursued and reviewed extensive document discovery, have successfully overcome a motion to dismiss, and have negotiated a fundamentally fair and reasonable settlement. Laufenberg MPA Decl. ¶ 21. Further, Plaintiffs have been model class representatives who have diligently pursued this case since its inception in order to obtain relief for absent class members. *See* ECF No. 89, Declaration of Yvonne Mart Fox in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Fox Decl."); ECF No. 90, Declaration of Grant Nesheim in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Nesheim Decl."); ECF No. 91, Declaration of Danielle Duckley in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Duckley Decl."); ECF No. 92 Declaration of Shelley Kitsis in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Kitsis Decl."). Plaintiffs understand that they are pursuing this case on behalf of all Settlement Class members and have a duty to protect the interests of all Settlement Class members, and they do not have any conflicts of interest with any other members of the Settlement Class. Fox Decl. ¶¶ 10-11; Nesheim Decl. ¶¶ 10-11; Duckley Decl. ¶¶ 10-11; Kitsis Decl. ¶¶ 10-11. Further, they have

actively participated in the litigation by frequently conferring with Class Counsel, reviewing the Complaint, and responding to discovery. Fox Decl. ¶¶ 3-6; Nesheim Decl. ¶¶ 3-6; Duckley Decl. ¶¶ 3-6; Kitsis Decl. ¶¶ 3-6. Plaintiffs will fairly and adequately represent and protect the interests of the Settlement Class. Moreover, since Plaintiffs and members of the Settlement Class are seeking redress from what is essentially the same alleged injury, there are no disabling conflicts of interest. *See* ECF No. 94 at 3.

### 2.    Rule 23(b)(3) Is Satisfied

In addition to meeting the four requirements of Rule 23(a), parties seeking class certification must demonstrate that the action is maintainable under one of the three subsections of Rule 23(b). Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Settlement Class satisfies Rule 23(b)(3).

### a.    Choice of Law Analysis

Analysis of choice of law is part of the predominance inquiry. *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2015 WL 9255571, at *10 (W.D. Wis. Dec. 18, 2015) (citing 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1780.1 (3d ed. 2005)). Here, the Court has already analyzed choice of law in the context of its Opinion and Order granting in part and denying in part UnityPoint's motion to dismiss. ECF No. 55. "Under Wisconsin law, choice-of-law decisions are made on an issue-by-issue basis," and "[i]f the laws of the competing states are the same on a given issue, then the court applies Wisconsin law on that issue." *Id.* at 12 (citing *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 829 (7th Cir. 2015)). With respect to the causes of action where there are significant differences between the laws of the

competing states, the Court applied the "two tests that Wisconsin courts apply to determine which law applies" and concluded that "the court will apply the laws of the nonforum states to the nonforum plaintiffs" where such differences exist. *Id.* at 12-14 (citing *Beloit Liquidating Tr. v. Grade*, 2004 WI 39, ¶ 24, 270 Wis. 2d 356, 677 N.W.2d 298). Because the laws of Wisconsin, Iowa, and Illinois recognize different versions of the economic loss doctrine, the Court analyzed Plaintiffs' negligence and negligence per se claims under each state's laws, and upheld the claims of Plaintiffs Fox and Nesheim under Wisconsin law, but dismissed the claims of Plaintiffs Duckley and Kitsis under the laws of Illinois and Iowa, respectively. *Id.* at 14-17. Similarly, the Court upheld the Wisconsin Statutory Claim, and dismissed all of Plaintiffs' Illinois and Iowa statutory claims. Thus, Wisconsin law applies to the claims of Plaintiffs Fox and Nesheim for negligence, negligence per se, and the Wisconsin Statutory Claim.

With respect to Plaintiffs' contract-based claims, which the Court upheld for all Plaintiffs, "[t]he Court need not conduct a choice-of-law analysis" as to these claims, "because common issues predominate regardless of the law applied." *See In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-md-2633-SI, 2019 WL 3410382, at *17 (D. Or. July 29, 2019). *In re Premera* involved an analogous breach of contract claim, where the defendant had entered into contracts in three states. *Id.* at *19. In certifying a nationwide settlement class, the Court reasoned that "[t]he basic elements of breach of contract are the same across states." *Id.* (quoting *In re Anthem, Inc. Data Breach Litg.,* 327 F.R.D. 299, 314 N.D. Cal. 2018)) (collecting cases). Further, "Courts routinely certify classes involving standardized conduct and standard from contracts and documents." *Id.* at *18 (collecting cases).

Here, as in *In re Premera*, "Plaintiffs' breach of contract claim is based on the Privacy Notice," and contracts by UnityPoint were entered into in only three states. *Id.* at *17. "The key issues of interpretation and breach asserted in this case do not require individualized adjudication."

*Id.* at \*18. "The central issue of breach turns on the common question [of] whether [UnityPoint's] security measures are adequate." *Id.* (first alteration in original) (quoting *In re Anthem*, 327 F.R.D. at 314). "The central issues of interpretation are whether [UnityPoint's] contracts incorporated by reference the Privacy Notice, whether the Privacy Notice created any obligation by [UnityPoint], and whether [UnityPoint] bears legal responsibility" for this notice. *Id.* "All of those involve common issues of law and fact and do not require the resolution of individualized inquiries." *Id.*

In its Opinion and Order, the Court did not identify any material differences between Illinois, Iowa, and Wisconsin state law with respect to Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. ECF No. 55. Even if there were material differences between the laws of the three states as to these claims, this "does not preclude certification of a nationwide class." *In re Premera*, 2019 WL 3410382, at \*19. "Because the individual state law issues do not 'swamp' the common issues and there are only three states involved, . . . common issues predominate even when portions of [p]laintiffs' [contract based] claims are governed by state law." *Id.* "Moreover, because trial manageability is not a concern when a court is considering certification at settlement, this difference in state law does not defeat predominance." *Id.* (citing *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 563 (9th Cir. 2019)). Applying these choice of law principles, common issues predominate over any variations in state law.

### b.    Common Questions of Fact and Law Predominate

The predominance factor "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The objective of Rule 23(b)(3) is to promote economy and efficiency in actions that are primarily for money damages. Where common questions "predominate," a class action can achieve economies of time, effort, and expense as compared to separate lawsuits, permit adjudication of

disputes that cannot be economically litigated individually, and avoid inconsistent outcomes, because the same issue can be adjudicated the same way for the entire class. *See* Fed. R. Civ. P. 23(b)(3) advisory committee's note (amended 1966). Plaintiffs are not required to prove that each element of their claims is "susceptible to classwide proof." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (citation omitted). Rather, the predominance inquiry measures the relative weight of the common questions as against individual ones. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The predominance requirement is satisfied when plaintiffs and class members share a common claim that is "capable of classwide resolution," meaning that determination of the claims' "truth or falsity will resolve an issue that is central to [the claims'] validity . . . in one stroke." *Dukes*, 564 U.S. at 350. Common issues predominate here, because the central questions at issue in this litigation can be established through generalized evidence.

The Settlement Class is well-suited for certification under Rule 23(b)(3) because questions common to Settlement Class members predominate over questions affecting only individual class members. Plaintiffs' claims for negligence, negligence per se, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and the Wisconsin Statutory Claim raise common issues capable of classwide resolution, and these issues predominate over any questions that would affect individual members. Each of these causes of action concerns the same fundamental questions of fact and law regarding UnityPoint's conduct, the Security Incidents, and the harm to Settlement Class members, including: whether UnityPoint owed a duty and had contractual obligations to safeguard Settlement Class members' PII and PHI; whether UnityPoint breached its duty and contractual obligations, resulting in the Security Incidents; whether Settlement Class members were harmed and incurred damages as a result of the Security Incidents; and whether UnityPoint was unjustly enriched. The resolution of these common issues

revolves around common evidence that does not vary from Settlement Class member to member, and so can be fairly resolved for all Settlement Class members at once. Similarly, resolving these questions as to one claim would resolve the other claims as well. *See In re Anthem*, 327 F.R.D. at 314 (the "main issue" of the plaintiffs' contract and negligence claims "boils down to the common factual contention of whether [the defendant's] data security levels were reasonable"). These common questions are "central to the validity of each one of the claims" and may be resolved "in one stroke." *See Dukes*, 564 U.S. at 350. Here, Settlement Class members were all allegedly harmed by the same conduct, and common factual and legal issues overwhelmingly predominate over individualized concerns. *See* ECF No. 94 at 4.

        **c.**    **Superiority**

Rule 23(b)(3) sets forth factors informing the superiority inquiry, including: (a) the interest of members of the Settlement Class in individually controlling separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against members of the Settlement Class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Because the claims in this case arise from uniform conduct by UnityPoint, a class action is the superior vehicle for determining the rights of absent class members. The main issues in this case can all be resolved using the same evidence for all Settlement Class members, making it the precise type of predominant question best resolved on a classwide basis. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). In contrast, resolution of these main issues through individual actions is impracticable: the amount in dispute for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)

(observing that class members seeking only a few hundred dollars would not "think so meager a prospect made suing worthwhile," "considering the costs and distraction of litigation"). Individual Settlement Class members may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish UnityPoint's liability. *See Beaton*, 907 F.3d at 1030-31 (affirming superiority because "potential recovery is too slight to support individual suits, but injury is substantial in the aggregate," and although "punitive damages may also deter, few litigants would risk filing suit on the off-chance that punitive damages would be recovered after years of litigation") (internal quotation marks and citation omitted). Further, individualized litigation increases the delay and expense to all parties, multiplies the burden on the judicial system, and presents a potential for inconsistent or contradictory judgments.

A class action represents the only realistic means through which the approximately 1.4 million Settlement Class members may obtain relief. *See Butler*, 727 F.3d at 801 ("[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (quoting *Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004))). The class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. *See* ECF No. 94 at 4. Accordingly, the class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Settlement Class members, as in other data breach cases where classwide settlements have been approved. *See, e.g.*, *In re Premera*, 2019 WL 3410382; *In re Anthem*, 327 F.R.D. 299.

## B.     The Court Should Grant Final Approval of the Settlement

Rule 23(e) requires court approval of any settlement that effects the dismissal of a class

action. Fed. R. Civ. P. 23(e). Settlement of class action litigation is favored. *See Isby*, 75 F.3d at

1196. "The Rule 23 class action settlement requires a hearing—the court may approve it only after

a hearing and on a finding that the settlement is fair, reasonable and adequate." *Bills v. TLC Homes*

*Inc.*, No. 19-CV-148-PP, 2020 WL 5982880, at *1 (E.D. Wis. Oct. 8, 2020) (citing Fed. R. Civ. P.

23(e)(2)). "The rule requires consideration of the following factors:

> (A) the class representatives and class counsel have adequately represented the class;

> (B) the proposal was negotiated at arm's length;

> (C) the relief provided for the class is adequate, taking into account:

>> (i) the costs, risks, and delay of trial and appeal;

>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

>> (iv) any agreement required to be identified under Rule 23(e)(3); and

> (D) the proposal treats class members equitably relative to each other."

*Id*. (citing Fed. R. Civ. P. 23(e)(2)). "The considerations in the rule overlap with the factors

articulated by the Seventh Circuit: '(1) the strength of the case for plaintiffs on the merits, balanced

against the extent of settlement offer; (2) the complexity, length, and expense of further litigation;

(3) the amount of opposition to the settlement; (4) the reaction of members of the class to the

settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount

of discovery completed.'" *Id*. (citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir.

2014)).[5]

### 1. The Rule 23(e)(2) Factors Are Satisfied

#### a. Adequate Representation

As discussed in detail above, Plaintiffs and Class Counsel have vigorously and adequately represented the Settlement Class—prosecuting the claims against UnityPoint and working tirelessly to gather the documents and information necessary to properly evaluate the case, to prepare for trial, and then to negotiate a robust settlement that provides significant relief to the Settlement Class. *See* Laufenberg MPA Decl. ¶¶ 27-28.

#### b. Arm's Length Negotiations

Settlement negotiations that involve arm's-length, informed bargaining with the aid of experienced counsel support a final finding of fairness. *See Wong*, 773 F.3d at 864. Here, the Settlement was negotiated at arm's-length between Plaintiffs' counsel and UnityPoint's counsel both directly between the Parties and in consultation with the Honorable Morton Denlow (Ret.), which took both in-person and additional telephonic mediation sessions to complete. *See* Laufenberg MPA Decl. ¶¶ 11-14. The time that it took to work out significant details and vigorous disagreements between the Parties demonstrates that this proposed resolution was the product of heavily contested and arm's-length negotiations. *Id.*

#### c. Adequacy of Relief

As set forth above and in additional detail below, the relief provided by the Settlement is reasonable and adequate, particularly in light of the risks and resulting delay of further motion

---

[5] These factors are not changed by the 2018 amendments to Rule 23(e)(2). The advisory committee's notes to Rule 23 indicate that "[t]he central concern in reviewing a proposed class action settlement is that it be fair, reasonable, and adequate," and the goal of the amendments "is not to displace any factor" articulated by a given circuit, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2), advisory committee's note (amended 2018).

practice, trial, and associated appeals.

**(i)    The Value of the Settlement Benefits**

<u>Credit Monitoring and Identity Theft Protection</u>. The Settlement provides Settlement Class members with comprehensive credit monitoring and identity theft protection services through Identity Guard's Total Plan for one year—a retail value of $200.04 per Settlement Class member ($16.67 per month for 12 months).[6] SA ¶ 20. Given a class size of approximately 1.4 million individuals, this is an enormous benefit, amounting to millions of dollars of value to Settlement Class members—for every 1% of the Settlement Class members who receive this service, the value to the Settlement Class is approximately $2.8 million.

<u>Reimbursement of Ordinary Expenses</u>. Under a simplified claims process, UnityPoint will pay 100% of all Ordinary Expenses up to $1,000 per Settlement Class member. SA ¶ 18. As detailed above, Ordinary Expenses include all documented out-of-pocket expenses related to the data breaches, including up to $45 each for lost time spent dealing with the aftermath of the Security Incidents. *Id.* Ordinary Expenses also include compensation for the costs of credit monitoring and identity theft protection services incurred between February 7, 2018 and March 2, 2022 (one year after the Claims Deadline), such that Settlement Class members can obtain compensation for more than three-and-a-half years of such services. *Id.* Moreover, the Identity Guard credit monitoring and identity theft protection services described above can be deferred for one year, such that Settlement Class members can effectively obtain or be compensated for more

---

[6] *See* Total Plan, Identity Guard, https://www.identityguard.com/plans/total (last visited November 24, 2020). The retail value of these services is the proper metric to apply, because this represents the value of the benefit Settlement Class members will actually receive. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *38 (N.D. Ga. Mar. 17, 2020) ("[T]he record shows that the high-quality credit monitoring offered here is more valuable than the free or low-cost services typically available," and "courts have often recognized the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees.") (collecting cases).

than two years of such services from the date of the Settlement. *See* SA ¶ 20.

Reimbursement of Extraordinary Expenses. UnityPoint will also pay 100% of all Extraordinary Expenses up to $6,000 per Settlement Class member. SA ¶ 19. As detailed above, Extraordinary Expenses include out-of-pocket expenses and up to $150 for extraordinary additional lost time spent resolving documented extraordinary losses incurred as a result of the Security Incidents. *Id.*

No Global Cap on Monetary Reimbursement. The monetary relief and credit monitoring services available to Settlement Class members are not subject to a global cap on settlement benefits, up to the individual limits on Ordinary Expenses and Extraordinary Expenses set forth above. This means that every Settlement Class member will be fully compensated for valid Claims, independent of the aggregate amount of other Claims submitted. This is a significant benefit as compared to other settlements, in which individual class member recovery is subject to pro rata reduction if the aggregate amount of claims exceeds a global cap or other limit.

Structural Relief. As part of the Settlement, UnityPoint has agreed to significant upgrades to its business practices and security efforts. SA ¶ 22. ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ SA Ex. A (filed under seal). ████████████████████████████████████████████████████████████████

*Id.* Given that UnityPoint continues to possess the PII and PHI of Settlement Class members, the strength of UnityPoint's data security will continue to be of significant importance to Settlement Class members for the foreseeable future. *See In re Anthem*, 327 F.R.D. at 319 ("Anthem must change its data retention policies, follow specific remediation schedules, and do annual IT security risk assessments and settlement compliance review," which "benefits millions of Settlement Class Members, including those who did not submit a claim form," and "this nonmonetary relief further

weighs in favor of final approval."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6 (8th Cir. 2018) ("[T]he injunctive relief offered under the settlement has value to all class members.") (collecting cases).

Cost of Notice and Claims Administration. In many class action settlements, the cost of class notice and claims administration is paid by class members out of settlement proceeds. That is not the case here. SA ¶ 52. Thus, in addition to the other amounts due under the Settlement, UnityPoint will pay 100% of the cost of class notice and claims administration. *Id.* To date, the costs of class notice and claims administration totals $462,153.42, and additional costs will be incurred to complete the settlement administration. *See* Notice Decl. ¶ 29.

Attorneys' Fees and Expenses. In many class action settlements, the fees and expenses of class counsel are paid by class members out of settlement proceeds. Here, in addition to the other amounts due under the Settlement, UnityPoint will pay up to $1,575,000 for Plaintiffs' attorneys' fees and costs, subject to Court approval. SA ¶ 53. The reasonableness of Class Counsel's requested fee and expense award are fully addressed in Plaintiffs' Motion for Attorneys' Fees, Costs and Incentive Awards.

Class Representative Incentive Awards. In many class action settlements, class representative incentive awards are paid by class members out of settlement proceeds. Here, in addition to the other amounts due under the Settlement, UnityPoint will pay up to $10,000 for Class Representative service awards. *Id.* ¶ 55. The reasonableness of Plaintiffs' requested incentive awards are fully addressed in Plaintiffs' Motion for Attorneys' Fees, Costs and Incentive Awards.

### (ii)     The Costs, Risks, and Delay of Trial and Appeal

Although all class actions involve a high level of risk, expense, and complexity, data breach litigation is especially risky and complex. *See Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases such

as the instant case are particularly risky, expensive, and complex."); *In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("Data breach litigation is complex and risky."). One of these risks is that UnityPoint could successfully oppose class certification. Courts have reached different decisions as to whether to grant class certification in data breach cases. *Compare In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 35 (D. Me. 2013) (denying certification), and *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 401 (D. Mass. 2007) (same), *with Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *13 (M.D. Ala. Mar. 17, 2017) (granting certification); *see also In re Anthem*, 327 F.R.D. at 318 ("While there is no obvious reason to treat certification in a data-breach case differently than certification in other types of cases, the dearth of precedent makes continued litigation more risky."). Further, case law specific to data breach litigation is currently evolving, with differing results, and there is no guarantee of the ultimate result. *See In re Anthem*, 327 F.R.D. at 318 ("Due to the unsettled nature of the legal questions, [p]laintiffs would likely have to contend with changing interpretations of procedural and substantive provisions throughout the course of the case."); *Gordon*, 2019 WL 6972701, at *1 ("Serious questions of law and fact regarding the merits of [p]laintiffs' claims and [d]efendant's defenses place the ultimate outcome of the litigation in doubt."); *In re Sonic Corp.*, 2019 WL 3773737, at *7 ("This unsettled area of law often presents novel questions for courts.").

In addition to obtaining class certification, Plaintiffs would have to overcome UnityPoint's motion for summary judgment, which would present issues of standing, causation, and damages. While Plaintiffs believe that they would prevail on these issues, certain of their claims have been dismissed at the pleading stage, and Plaintiffs would face the risk of losing some or all of their remaining claims before trial. Moreover, Plaintiffs would have to prevail at trial and in any subsequent appeals. Also, the cost for UnityPoint and Plaintiffs to maintain the lawsuit would be

high, given the amount of documentary evidence as well as the substantial expert costs both Parties would incur in the context of class certification, summary judgment, and trial. As such, the current Settlement strikes an appropriate balance between Plaintiffs' "likelihood of success on the merits" and "the amount and form of the relief offered in the settlement." *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

### (iii)    The Proposed Distribution of Settlement Benefits

The Settlement also provides an effective method of distributing relief to the Settlement Class through simplified processing of Claims. The claims protocol is straightforward and is designed to facilitate the filing of Claims with maximum clarity and ease. Claimants can complete and submit either a written or online claim form to the Claims Administrator, postmarked or electronically submitted on or before March 2, 2021. SA ¶¶ 18-19. The claims process will allow Settlement Class members to elect credit monitoring and identity theft protection benefits, identify any Ordinary Expenses and any Extraordinary Expenses they have incurred, and submit any information, documentation, verifications, and/or attestations required to obtain reimbursement. *Id*. The Claims Administrator will review Claim forms using reasonably exercised discretion, subject to comprehensive procedures for dispute resolution. *Id*. ¶ 46. If the Claims Administrator determines that a Claim is incomplete, the Claimant is given an opportunity to supplement the Claim. *Id*. Any Claims rejected by the Claims Administrator are referred to the Parties for review, and are subsequently referred to a Claims Referee if the Parties are unable to reach agreement as to a given Claim. *Id*. ¶ 47. The Claims Administrator will create a Settlement Website, establish and maintain a toll-free telephone number, and create a mailing address through which Settlement Class members can obtain information and file Claims. *Id*. ¶ 29(c).

### (iv)    Fees, Costs, and Incentive Awards

Plaintiffs seeks and UnityPoint has agreed not to oppose an award of attorneys' fees and

reimbursement of litigation costs and expenses in an amount not to exceed $1,575,000. SA ¶ 54. UnityPoint will pay the fee award in addition to any benefits provided to Settlement Class members and the cost of settlement administration. *Id*. The named Plaintiffs also seek and UnityPoint has agreed to pay an incentive award of $2,500 to each named Plaintiff, subject to Court approval. *Id*. ¶ 55. The Parties did not negotiate attorneys' fees and costs or incentive awards until after they had agreed upon all substantive elements of the Settlement. *Id*. ¶¶ 54-55. Further, this component of the Settlement was negotiated at arm's-length under the direction of an experienced mediator.

### d.    Equitable Treatment of Class Members

The Settlement treats Settlement Class members equitably relative to each other. All Settlement Class members are eligible for one year of credit monitoring—a consistent remedy appropriate across the entire Settlement Class. The Settlement provides for different relief to Settlement Class members who have incurred different damages resulting from the Security Incidents, allowing specific Claims for Ordinary Expenses or Extraordinary Expenses. To the extent Settlement Class members receive different compensation under the Settlement, it will reflect their different losses and be proportionate to their actual harms.

### 2.    The Settlement Is Fair, Reasonable, and Adequate

### a.    Strength of Plaintiffs' Case

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). The "evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case." *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017). In

evaluating the fairness of the settlement, the Court views the facts in the light most favorable to the settlement. *Isby*, 75 F.3d at 1199. Further, the court must not substitute its own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *Armstrong*, 616 F.2d at 315. Here, the settlement negotiations were hard-fought, with both Parties' counsel thoroughly familiar with the applicable facts, legal theories, and defenses. *See* Laufenberg MPA Decl. ¶ 20. Plaintiffs believe that the Settlement is an outstanding result considering the issues addressed below.

Although Plaintiffs believe that proving UnityPoint's liability would be possible here, the Parties disagree diametrically about the merits, and there is substantial uncertainty as to the ultimate outcome of this litigation. Experience in other data breach cases suggests that class certification and summary judgment would present challenges. While Plaintiffs feel that their substantive claims are meritorious, UnityPoint has heavily contested the merits of those claims, and there is at least a possibility that a fact finder could find against Plaintiffs on some or all of their claims. There is no assurance that the Settlement Class would prevail—or, even if they did, that they would be able to obtain an award of damages significantly higher than achieved here absent such risks. Thus, in the eyes of Class Counsel, the Settlement provides the Settlement Class with an outstanding opportunity to obtain significant relief at this stage in the litigation. The Settlement also obviates the risks that might prevent them from obtaining any relief. *Id*. ¶ 26.

Given these considerations, final approval of the Settlement is appropriate to avoid the uncertainties of continued litigation. *See Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2013 WL 6511860, at *3 (E.D. Mich. Dec. 12, 2013) ("Settlement provides a certain and immediate benefit to the class members and outweighs the risk and cost of a trial on the merits," and "[t]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery.") (alteration in original) (internal quotation marks and citation omitted).

### b.    Complexity, Length, and Expense of Further Litigation

As set forth above in Section IV.B.1.c.ii, in light of the significant costs, risks, and delay of trial and appeal, the Settlement strikes an appropriate balance between Plaintiffs' "likelihood of success on the merits" and "the amount and form of the relief offered in the settlement." *See Carson.*, 450 U.S. at 88.

### c.    Opinions of Competent Counsel

Courts hold that the opinion of competent counsel weighs in favor of settlement. *Isby*, 75 F.3d at 1200. Here, the Settlement was negotiated by counsel with extensive experience in consumer class action litigation. *See* Laufenberg MPA Decl. ¶ 24 & Ex. 2; ECF No. 87, Declaration of Ronald A. Marron in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ¶¶ 7-33 & Ex. 1; Declaration of Robert L. Teel in Support of Plaintiffs' Motion For Attorneys' Fees, Costs, And Incentive Awards ¶¶ 24, 29–37.   Based on their experience, Class Counsel concluded that the Settlement provides exceptional results for the Settlement Class while sparing the class from the uncertainties of continued and protracted litigation. *See* Laufenberg MPA Decl. ¶ 25. This factor weighs in favor of approval. *See, e.g.*, *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (opinion of class counsel, who were skilled and experienced in securities litigation, weighed in favor of approval of settlement).

### d.    Stage of Proceedings and Amount of Discovery Completed

Under this factor, courts evaluate whether class counsel had sufficient information to make an informed decision about the merits of the case. *See In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966 (N.D. Ill. 2011). As discussed above, Plaintiffs conducted extensive research into the potential claims of Settlement Class members, filing two amended complaints to add new parties and address factual developments including a second data

breach. Further, the Parties have engaged in extensive discovery that included several sets of written discovery and document requests, and resulted in UnityPoint producing hundreds of thousands of pages of documents for Plaintiffs' review. *See* Laufenberg MPA Decl. ¶ 8. These documents have allowed the Parties to sufficiently evaluate the strengths and weaknesses of their respective cases. The Settlement is thus the result of fully-informed negotiations.

## VII.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court enter their proposed order finally certifying the Settlement Class and granting final approval of the Settlement, and execute the proposed final judgment of dismissal with prejudice.

Respectfully submitted,

s/ *Cari Campen Laufenberg*
Cari Campen Laufenberg (*pro hac vice*)
Adele A. Daniel (*pro hac vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
claufenberg@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (*pro hac vice*)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

s/ *Ronald A. Marron*
Ronald A. Marron
Kas L. Gallucci
Michael T. Houchin
Lilach Halperin
**Law Offices of Ronald A. Marron**
651 Arroyo Drive
San Diego, California 92103
Tel.: (619) 696-9006
Fax: (619) 564.6665
*ron@consumersadvocates.com*
*kas@consumersadvocates.com*
*mike@consumersadvocates.com*
*lilach@consumersadvocates.com*

*s/ Robert L. Teel*
Robert L. Teel
*Of Counsel* to the
**Law Offices of Ronald A. Marron**
1425 Broadway, Mail Code: 20-6690
Seattle, WA 98122
Tel.: (866) 833-5529
Fax: (855) 609-6911
*lawoffice@rlteel.com*

***Attorneys for Plaintiffs and the Putative Settlement Class***